# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEON GILBERT and MICHAEL MCGARVEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0513-PAF |
| UNISYS CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 2, 2024
Date Decided: August 13, 2024

John M. Seaman, E. Wade Houston, Joseph A. Sparco, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Nicholas G. Hill, Rebecca M. Borkovich, MCGUIREWOODS LLP, Atlanta, Georgia; *Attorneys for Plaintiffs Leon Gilbert and Michael McGarvey*.

David E. Ross, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Martin L. Roth, P.C., KIRKLAND & ELLIS LLP, Chicago, Illinois; Haley S. Stern, Amanda Lamothe-Cadet, Maylynn Chen, KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Defendant Unisys Corporation*.

**FIORAVANTI, Vice Chancellor**

Plaintiffs Leon Gilbert and Michael McGarvey are former employees of Defendant Unisys Corporation ("Unisys" or the "Company"). Both Gilbert and McGarvey joined the Company in early 2021—Gilbert as a Senior Vice President and McGarvey as a Vice President—to help build and grow the Company's new Digital Workplace Solutions business unit ("DWS").

In early 2023, Gilbert and McGarvey left Unisys to return to their previous employer. Unisys responded with a lawsuit in Pennsylvania federal court, accusing Gilbert and McGarvey of having stolen Unisys information and asserting a variety of claims. Plaintiffs seek advancement of their legal fees and expenses incurred in defending themselves in the Pennsylvania action. Unisys maintains that it has no obligation to do so.

For the reasons explained below, the court concludes that both Plaintiffs are entitled to advancement of their legal fees and expenses in the Pennsylvania action. Accordingly, judgment will be entered in their favor.

## I.     BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis of the claims. The trial record consists of trial testimony from seven witnesses, deposition testimony from seven witnesses, and approximately 200 exhibits. Attentive readers will observe that, as a result of gaps in the parties' numbering scheme, the exhibit numbers range into the high 200s. The deposition testimony is cited as "Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial

## A. Unisys and Its Advancement Rights

Defendant Unisys is an information technology company headquartered in Blue Bell, Pennsylvania.[2] Unisys is a Delaware corporation.[3] The Company offers broad indemnification and advancement rights under its certificate of incorporation and its bylaws. A brief summary of those provisions will help set the stage for the parties' dispute.

## B. Unisys's Certificate of Incorporation and Bylaws

### 1. Indemnification and advancement provisions

Section 2(a) of Article X of the Company's Restated Certificate of Incorporation, dated April 29, 2010 (the "Certificate"),[4] grants indemnification and advancement rights to individuals involved in a legal action "by reason of the fact" that they (i) served as directors or officers of Unisys or (ii) served at the request of Unisys as a director, officer, employee, or agent "of another corporation or of a

---

order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2] PTO ¶ 2.

[3] *Id.*

[4] JX 1.

partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans."[5]  Section 2(a) provides, in pertinent part:

> Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer, of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law. . . .
>
> The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition; provided, however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Section or otherwise.[6]

---

[5] *Id.* Art. X § 2(a).

[6] *Id.*

Section 2(b) of Article X of the Certificate provides that an individual may file suit against Unisys to recover any unpaid indemnification or advancement claims, and "if successful in whole or in part," is entitled to expenses for prosecuting such claims.[7]

### 2. Selection of Unisys's officers

The Certificate does not define "officer." To determine whether someone serves as an officer, one must refer to Article IV of the Company's Amended and Restated Bylaws, dated December 14, 2022 (the "Bylaws").[8]

Section 1 of Article IV of the Bylaws provides that the officers of the Company "shall be chosen by the Board of Directors and shall be a Chief Executive Officer, a President, one or more Vice Presidents, a Secretary, a Treasurer, a Controller and such other officers as may be elected in accordance with the provisions of Section 3 of this Article IV."[9]

---

[7] *Id.* Art. X § 2(b). Section 2(b) states, in pertinent part:

> If a claim under Paragraph (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim.

[8] JX 112.

[9] *Id.* Art. IV § 1. "The Vice Presidents shall perform such duties as may from time to time be assigned to each and any of them by the Board of Directors or by the Chief Executive

Section 2 states that the Company's officers, "except those appointed by delegated authority pursuant to Section 3 of this Article IV, shall be elected annually by the Board of Directors, and each such officer shall hold office for a term of one year and until a successor is elected and qualified, or until such officer's earlier resignation or removal."[10]

Section 3 provides the Company's board of directors (the "Board") with discretion to elect "such other officers, which may include, at the Board's discretion, the Chair of the Board and a Vice Chair."[11]  The Board "may delegate to any officer or committee the power to appoint subordinate officers and to retain or appoint employees or other agents, or committees thereof, and to prescribe the authority and duties of such subordinate officers, committees, employees or other agents."[12]

Between 2021 and June 2023, there were over 150 individuals with the title of Vice President at Unisys.[13]  The Board did not, however, formally elect all of

---

Officer.  A Vice President or Vice Presidents may have such additional designations as the Board may approve."  *Id.* Art. IV § 6.

[10] *Id.* Art. IV § 2.

[11] *Id.* Art. IV § 3.

[12] *Id.*

[13] Tr. 165:23–166:7 (Thomson) ("Q:  And Unisys has fewer than 200 vice presidents; correct?  A:  That sounds about right. . . .  Q:  More or less than 150?  A:  I would think it's a little more.").

6

those individuals as officers.[14]  Neither Gilbert nor McGarvey were formally elected as officers by the Board.[15]

### C.    Unisys's Business Restructuring

#### 1.    Unisys transitions to a global business unit model

Through 2019, Unisys conducted business under a regional siloed model with four regional sectors:  (1) United States and Canada; (2) Latin America; (3) Europe, Middle East, and Africa; and (4) Asia Pacific.[16]  In 2020, Unisys began a "transformational journey" to replace its regional siloed model with a global business unit model.[17]  In March 2020, Unisys sold its federal government contracts business (the "Federal Sale") and planned to use the proceeds to invest in other areas

---

[14] Altabef Dep. at 12:14–21 ("We have many people who have titles that might be seen as, you know, a vice president, for instance, that is not elected -- or a senior vice president, that is not elected as an officer of the company, but still has a title of vice president or senior vice president.").

[15] Tr. 39:10–13 (Gilbert) ("Q:  You agree you were not elected as an officer by the Unisys board of directors at any Unisys board meeting; correct?  A:  That is correct."); *id.* at 79:23–80:2 (McGarvey) ("Q:  To the best of your knowledge, you were never elected as an officer by the board of Unisys; correct?  A:  Not that I'm aware of."); *see* Pls.' Proposed Findings of Fact ¶ 71.

[16] Altabef Dep. at 49:18–23 (explaining that prior to Unisys's business reorganization, it operated its business "around geographies"); Ebrahimi Dep. at 15:11–12.

[17] JX 41 at UNISYS_ADV_00022428; Ebrahimi Dep. at 16:15–23 ("So at the time we did not have business units as they are defined today, and those business unit solutions, or our products.  We had practices and a variety of other models in order to sell our solutions. The BU model actually created clarity in the market for our solutions and for what we sell and -- and really propelled us into a global go-to-market approach.").

of its business.[18]  Following the Federal Sale, Unisys retained McKinsey & Company and AlixPartners to advise the Company on restructuring its business operations through an initiative titled "Project Minerva."[19]  McKinsey advised the Company that it could "transform its portfolio" by "focus[ing] on growing 2-3 meaningful businesses,"[20] including by transitioning from selling traditional end user services ("EUS") to end user experience services ("EUX").[21]

Beginning in the second half of 2020, Unisys set out to transform DWS to differentiate Unisys in the marketplace.[22]  The Company's specific focus was on "adding value to our clients in the area of DWS through design-thinking, differentiated end-user experience and increased productivity" and "expand[ing] on our legacy [EUS] approach to one of [EUX]."[23]  Unisys expected that DWS would "lead the market" by "rapidly . . . creating new EUX offers."[24]

---

[18] JX 41 at UNISYS_ADV_00022428; Altabef Dep. at 46:12–47:11; JX 42 at 2.

[19] Altabef Dep. at 119:20–120:3; *id.* at 47:12–48:13.

[20] JX 20 at UNISYS_ADV_00000908.

[21] *Id.* at UNISYS_ADV_00000915.

[22] PTO ¶ 12.

[23] JX 155 at UNISYS_ADV_00034252; *see also* JX 42 at 4 (explaining at a January 2021 investor presentation that Unisys is "doubling down in [EUX]" because "there is a dramatic difference between the growth of [EUX] versus the very modest flat growth of the rest of the market" in DWS).

[24] JX 41 at UNISYS_ADV_00022431.

As of January 1, 2021, Unisys restructured its operations into four business units: (1) DWS; (2) Cloud & Infrastructure Solutions ("C&I"); (3) ClearPath Forward Franchise ("CPF"); and (4) Business Platforms Service ("BPS").[25] DWS, C&I, and CPF are considered "strategic lines of business," while BPS is a "'non-core' line of business."[26] Following the restructuring, Unisys analyzed its new corporate structure to determine if it affected the Company's reporting obligations and determined that DWS, C&I, and CPF were "reportable segments" that required separate reporting under GAAP.[27] Unisys has since presented information on its

---

[25] JX 22 at UNISYS_ADV_00028059; JX 90 at 6 ("In January 2021, the company changed its organizational structure to more effectively address evolving client needs."); JX 155 at UNISYS_ADV_00034252 (explaining that one of the "strategic outcomes from Project Minerva" was a focus on four business units and listing DWS, C&I, CPF, and BPS as the four business units).

[26] JX 28 at UNISYS_ADV_00029673.

[27] *Id.* at UNISYS_ADV_00029672; JX 22 at UNISYS_ADV_00028063–64. "GAAP-mandated segment reporting disclosures are designed to provide decision-useful information about smaller components of a larger public entity to allow users of its financial statements to make informed judgments regarding the public entity as a whole." JX 143 ¶ 11 (footnotes omitted). Reporting companies must identify any operating segments, which, definitionally, engage in business activities from which the corporation may recognize revenues and incur expenses, the results of which the corporation's chief operating decision maker regularly reviews to assess performance and resource allocation, and for which discrete financial information is available. *Id.* ¶ 20; JX 147 ¶ 14. "Reportable Segments are defined as Operating Segments or aggregations of Operating Segments for which revenue, profit or loss, or assets exceed 10 percent of the combined entity's revenue, profit or loss, or assets." JX 147 ¶ 13 (internal quotation marks omitted).

DWS, C&I, and CPF reportable segments in its public filings.[28] Each reportable segment is managed by a senior vice president.[29]

### 2. Unisys hires Gilbert and McGarvey

On January 6, 2021, Unisys formally offered Gilbert a position "in our Digital Workplace Services organization as the Senior Vice President, Digital Workplace Services," and Gilbert began at Unisys the next month.[30] Prior to being hired by Unisys, Gilbert served as the head of Digital Workplace Practice ("DWP") at Atos SE ("Atos"), a French information technology company.[31]

Gilbert executed an employment agreement with Unisys on April 26, 2024.[32] Gilbert's employment agreement is based on the form of employment agreement that Unisys's uses for its executive officers, which the Company refers to as the change in control employment agreement.[33] Gilbert's employment agreement provided, in part:

---

[28] *See, e.g.*, JX 90 at 6, 22–23 (listing DWS, C&I, and Enterprise Computing Solutions as reportable segments in the Company's 2021 annual report on Form 10-K and presenting segment results); JX 159 at 6, 24–25 (same for the Company's 2022 annual report on Form 10-K).

[29] Tr. 158:13–15 (Thomson).

[30] JX 39 at GM_DelLit_0000236; Tr. 5:3–5 (Gilbert).

[31] JX 24 at UNISYS_ADV_00023616; PTO ¶ 5.

[32] JX 65.

[33] PTO ¶ 17; *compare* JX 3 (form of employment agreement), *with* JX 65 (Gilbert April 2021 employment agreement).

The Board of Directors of the Company (the "Board") has determined that it is in the best interests of the Company and its stockholders to assure that the Company will have the continued dedication of the Executive, notwithstanding the possibility, threat or occurrence of a Change of Control (as defined below) of the Company. The Board believes it is imperative to diminish the inevitable distraction of the Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change of Control and to encourage the Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change of Control, and to provide the Executive with compensation and benefits arrangements upon a Change of Control which ensure that the compensation and benefits expectations of the Executive will be satisfied and which are competitive with those of other corporations. Therefore, in order to accomplish these objectives, the Board is causing the Company to enter into the Employment Agreement with Executive.[34]

In addition to his employment agreement, Gilbert executed a severance agreement with Unisys.[35] Katherine Ebrahimi, then the Senior Vice President and Chief Human Resources Officer of Unisys, counter-signed Gilbert's employment agreement and his severance agreement for Unisys.[36] Ebrahimi was an officer of Unisys.[37] Ebrahimi did not have express authority from the Board to designate

---

[34] JX 65 at GM_DelLit_0000011; PTO ¶ 17.

[35] JX 66. The severance agreement attached a form release providing, in part, that the signatory was "not releasing . . . (ii) any claims for indemnification under the Company's certificate of incorporation or bylaws and/or directors & officers liability insurance coverage . . . ." *Id.* at 10. Gilbert executed the release. PTO ¶ 18.

[36] JX 65 at GM_DelLit_0000024; JX 66 at UNISYS_ADV_00015295; PTO ¶ 19.

[37] PTO ¶ 19.

officers of the Company.[38]  At no time did Unisys ever publicly represent or tell Gilbert that he was an officer of the Company.[39]

As the leader of the DWS business unit, Gilbert had approximately 6,500 employees under his management.[40]  All employees who work within the DWS business unit are employees of Unisys.[41]  Gilbert served as Senior Vice President and General Manager of DWS and "as a member of the Unisys Executive Leadership Team" during his tenure at Unisys.[42]  According to the "Leadership" section of Unisys's website, Gilbert was one of only fifteen members of the Leadership team.[43] Nine members of the Leadership team held the title of Senior Vice President, as Gilbert did.[44]  The Leadership team's fifteen members included Peter Altabef,

---

[38] *See* Ebrahimi Dep. at 79:3–81:4.

[39] *See* Tr. 39:10–23 (Gilbert) ("Q:  You agree you were not elected as an officer by the Unisys board of directors at any Unisys board meeting; correct?  A:  That is correct.  Q: None of the Unisys individuals you met with during the hiring process told you you were being hired as an officer of Unisys; correct?  A:  Correct.  They told me that I was being hired as an executive of Unisys.  Q:  And, in fact, you never discussed who was an Unisys officer and who was not an officer while being recruited to Unisys; correct?  A:  It was never a discussion during that or any other meeting in my time at Unisys.").

[40] *Id.* at 146:6–10 (Thomson).

[41] *Id.* at 146:14–16 (Thomson); Def.'s Proposed Findings of Fact ¶ 55; Pls.' Proposed Findings of Fact ¶ 46.

[42] PTO ¶ 3.

[43] *Id.* ¶ 24 (citing JX 113).

[44] JX 113; PTO ¶ 24.

Unisys's Chief Executive Officer and Debra McCann, Unisys's Chief Financial Officer.[45]

When Gilbert first joined Unisys, Gilbert recommended that Unisys hire McGarvey, who was then a Vice President and Chief Technology Officer of DWP at Atos.[46] On February 22, 2021, Unisys hired McGarvey to serve as the "Vice President of Solutions Management" for DWS.[47] McGarvey's offer letter described DWS as Unisys's "Digital Workplace Services organization."[48] During his tenure at Unisys, McGarvey reported directly to Gilbert.[49] A December 1, 2021, Unisys organization chart identified McGarvey as a member of Unisys's "Enterprise Leadership."[50] While serving as Vice President of Solutions of DWS, McGarvey functioned as the chief technology officer, or CTO, of DWS,[51] but he did not have

---

[45] JX 113; PTO ¶ 24.

[46] JX 164 at GM_DelLit_0000244 (saying that Gilbert "would like for us to get my DWP CTO ASAP"); JX 167 at GM_DelLit_0000433.

[47] JX 47 at 1.

[48] *Id.*

[49] *Id.* ("You will be reporting to the SVP and GM of Digital Workplace Services.").

[50] JX 85 at UNISYS_ADV_00017699.

[51] Tr. 71:18–20 (McGarvey) ("[I]n DWS, I was sort of functioning as both the head of portfolio and the chief technical officer as one."); Thomson Dep. at 34:25–35:2 ("Mike McGarvey would have been his, I'll say, chief technology officer of the DWS Business."); Tr. 186:23–187:1 (Thomson) (Q: And to confirm, this is you characterizing Mr. McGarvey as the CTO of DWS; right? A: It is.").

that official title. At no time did Unisys ever tell McGarvey or publicly represent that he was an officer of the Company.[52]

### 3. Acquisition of Unify Square

In 2021, Unisys looked for opportunities to expand DWS through M&A.[53] During a March 2021 Board meeting, Gilbert recommended that Unisys acquire Unify Square, Inc. ("Unify Square").[54] The "target of the 2021 Unify Square acquisition under Gilbert's leadership" was its PowerSuite EUX offering.[55] At the meeting, the Board resolved to submit a letter of intent to Unify Square "with respect to the Proposed Transaction including a purchase price of up to $155 million" and authorized Unisys's "Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, General Counsel and Secretary or any other officer of the Corporation with the title of 'Vice President' or higher . . . to negotiate, execute and deliver the LOI, the Purchase Agreement and any related definitive agreements[.]"[56]

---

[52] *See* Tr. 79:9–13, 79:23–80:2, 82:12–17 (McGarvey).

[53] JX 155 at UNISYS_ADV_00034252 (explaining that the DWS transition will "include partner investments, additional offerings from Unisys, and potentially, the addition of key solutions from other companies via acquisition"); JX 68 at UNISYS_ADV_00027922 (discussing how M&A activity to build out solutions for DWS and C&I "supports the long-term plan and can contribute to future revenue and profit margin growth").

[54] JX 54 at UNISYS_ADV_00011956 (describing Gilbert as having explained "how Unify Square's capabilities complement those of the DWS business and how the skill sets of the combined entity would compare to those of key competitors in the DWS space").

[55] JX 170 at 4; *accord* Tr. 174:13–15 (Thomson).

[56] JX 54 at UNISYS_ADV_00011958.

Gilbert worked with the M&A team to negotiate the Unify Square acquisition, but did not execute Unisys's letter of intent or the purchase agreement.[57]

On June 3, 2021, Unisys acquired Unify Square for a purchase price of $150.4 million.[58] After closing the acquisition, Unisys placed three of its employees, Erin Mannix, Gary Polikoff, and John Bereschak, on the Unify Square board of directors (the "Unify Square Board").[59] That same day, the Unify Square Board, acting via unanimous written consent, appointed Gilbert to serve as the President of Unify Square.[60]

Unisys held Unify Square as a wholly owned subsidiary after the acquisition.[61] On June 4, 2021, Gilbert, Altabef, and Ebrahimi led Unify Square's all-hands integration meeting.[62] Gilbert oversaw the integration of Unify Square into DWS.[63] While integrating Unify Square into DWS, Unisys continued to make

---

[57] Tr. 28:12–29:10, 52:3–13, 53:12–14 (Gilbert).

[58] JX 90 at 45; *see* JX 73 at UNISYS_ADV_00013000.

[59] Tr. 179:5–9 (Thomson); *see* JX 74 at UNISYS_ADV_00012984. Mannix was a Unisys officer who served as Vice President, Chief Accounting Officer and Corporate Controller at Unisys. JX 137 at 6. Polikoff was a Unisys officer who served as Assistant Treasurer at Unisys. *Id.* at 7. Bereschak served in Unisys's treasury function. Tr. 178:8–10 (Thomson).

[60] JX 74 at UNISYS_ADV_00012983.

[61] JX 88 at UNISYS_ADV_00027935.

[62] JX 75 at UNISYS_ADV_00012509.

[63] Tr. 175:6–8 (Thomson); *id.* at 179:10–14 (Thomson).

headway in the EUX space. On November 18, 2021, Unisys also acquired "the Mobinergy group of companies . . . to advance the company's experience-focused Digital Workplace Solutions set" by incorporating an EUX offering that Mobinergy had provided.[64]

On December 3, 2021, six months after Unisys's acquisition of Unify Square, the Board voted to merge Unify Square into Unisys, resolving that "the preservation of the separate existence of Unify Square . . . is no longer desirable in the conduct of the Corporation's and its subsidiaries' businesses, taken as a whole."[65]

### D.     The Pennsylvania Action

After leading the DWS business unit for two years, Gilbert and McGarvey departed Unisys in early 2023 and returned to work for Atos.[66]

On February 13, 2023, Unisys filed a complaint against Gilbert and McGarvey in the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania Action").[67] In the Pennsylvania Action, Unisys alleges that Gilbert and McGarvey improperly solicited talent from Unisys and downloaded thousands of Unisys documents containing critical business strategies and technologies prior

---

[64] JX 90 at 6; JX 170 at 2, 5.

[65] JX 88 at UNISYS_ADV_00027935–36.

[66] Tr. 4:23–5:5 (Gilbert); *id.* at 67:20–68:11 (McGarvey).

[67] PTO ¶ 25 (citing JX 118).

16

to their departures from Unisys.[68]  Unisys's amended complaint in the Pennsylvania Action asserts claims against Gilbert and McGarvey under the Defend Trade Secrets Act, under the Pennsylvania Uniform Trade Secrets Act, and for breach of contract.[69]

The operative complaint in the Pennsylvania Action alleges that Gilbert and McGarvey participated in Unisys's "confidential discussions at the highest executive level, including those related to Unisys'[s] confidential company-wide strategies" and "were privy to Unisys'[s] proprietary technical documents, design ideas, business strategies, customer lists and strategies, pricing, product planning, cost management, design guidelines, and research and development ('R&D') efforts while employed at Unisys."[70]  It further alleges that Gilbert and McGarvey "misappropriated Unisys'[s] confidential information and trade secrets to benefit themselves and Atos, and to allow Atos to unfairly compete against Unisys by using Unisys'[s] trade secrets" and breached "Proprietary Information/Non-Compete and Compensation Agreements" that they signed as Unisys employees.[71]

---

[68] JX 118 ¶¶ 6, 9, 12, 28, 37, 40.

[69] JX 125 ¶¶ 62–101.  The amended complaint in the Pennsylvania Action, which Unisys filed on March 8, 2023, added Atos and Atos IT Solutions and Services, Inc. ("Atos IT"), a wholly owned subsidiary of Atos, as defendants and asserted a claim for tortious interference with contract against both.  *Id.* ¶¶ 1, 19, 102–108; *see* JX 126.  The amended complaint is the operative complaint in the Pennsylvania Action.

[70] JX 125 ¶ 4.

[71] *Id.* ¶¶ 67, 79, 89–90, 98–99.

On February 27, 2023, Plaintiffs demanded advancement from Unisys for legal expenses incurred in connection with the Pennsylvania Action (the "Demand Letters").[72] In his Demand Letter, Gilbert asserted that he was entitled to indemnification and advancement under Section 2(a) of Article X of the Certificate and 8 *Del. C.* § 145 "[b]ecause [he] was made a party to the [Pennsylvania Action] by reason of the fact of his service as Senior Vice President and General Manager for DWS at Unisys and a member of the Unisys Executive Leadership Team[.]"[73] McGarvey similarly demanded indemnification and advancement "[b]ecause [he] was made a party to the [Pennsylvania Action] by reason of the fact of his service as Vice President of Solution Management, DWS at Unisys[.]"[74] Each Demand Letter was accompanied by a signed undertaking.[75]

On March 15, 2023, Plaintiffs sent a second advancement demand to Unisys, asserting that they had incurred more than $800,000 in legal fees and costs in defending the Pennsylvania Action to date and requesting that "Unisys promptly advance the $520,175.92 incurred in February 2023."[76] On March 23, 2023, Unisys

---

[72] JX 121; JX 122; PTO ¶ 27.

[73] JX 121 at 1.

[74] JX 122 at 1.

[75] JX 121 at 3–4; JX 122 at 3–4.

[76] JX 128; PTO ¶ 33.

refused Plaintiffs' advancement demand.[77] Unisys asserted that Plaintiffs were "not directors or officers of Unisys."[78] Unisys also asserted that the Pennsylvania Action did not challenge any actions that Gilbert and McGarvey had taken in a covered capacity.[79]

Gilbert and McGarvey separately sought advancement from Atos in connection with the Pennsylvania Action in February 2023.[80] Atos agreed to advance Gilbert and McGarvey litigation expenses incurred in the Pennsylvania Action through Atos IT, "conditioned upon the [Plaintiffs'] agreement to seek to obtain advancement, and ultimately to seek indemnification, from Unisys."[81] Atos and its insurers have advanced approximately $4.5 million in fees incurred by Plaintiffs in the Pennsylvania Action.[82]

---

[77] JX 130.

[78] *Id.* at 2.

[79] PTO ¶ 34; JX 130 at 2. In addition, Unisys asserted that Gilbert and McGarvey were not entitled to advancement because they had not met the standard of conduct for indemnification. JX 130 at 3–4.

[80] JX 257; JX 279.

[81] JX 257 at 2; JX 279 at 2; *see also* JX 267 at 2.

[82] JX 267 Ex. A; *see also* JX 267 at 2 (stating that Plaintiffs have not paid any of their expenses incurred defending the Pennsylvania Action out of pocket).

## E.    Procedural History

After Unisys denied Plaintiffs' demands for advancement, Plaintiffs commenced this advancement action on May 9, 2023, seeking advancement and fees on fees.[83]  On June 7, 2023, Plaintiffs moved for judgment on the pleadings on all counts in the complaint.[84]  After briefing and oral argument, the court issued a telephonic ruling on October 27, 2023, denying Plaintiffs' motion for judgment on the pleadings.[85]

After heated discovery practice,[86] Plaintiffs were granted leave to file an amended complaint.[87]  The court held a one-day trial on April 1, 2024.[88]  After the trial, the court requested supplemental submissions, the last of which were received on July 2, 2024.[89]  On July 22, 2024, Plaintiffs informed the court by letter

---

[83] Dkt. 1.  That same day, Plaintiffs provided Unisys's outside counsel with copies of invoices documenting legal expenses from the Pennsylvania Action for which they seek advancement.  PTO ¶ 36.  Defendant answered the original complaint on May 26, 2023. Dkt. 8.

[84] Dkt. 18.

[85] Dkts. 18, 20–21, 25, 29.

[86] Dkt. 37 (Plaintiffs' February 19, 2024 Motion to Coordinate Expedited Discovery); Dkt. 39 (Plaintiffs' February 23, 2024 Motion to Compel); Dkt. 55 (Defendant's March 14, 2024 Motion for a Protective Order); Dkt. 74 (Defendant's March 19, 2024 Motion for Continuance); *see* Dkts. 53–54, 56, 59, 69–70, 76 (addressing discovery disputes).

[87] Dkt. 76.

[88] Dkt. 100.

[89] Dkts. 113, 115, 117, 124–25.

submission that trial in the Pennsylvania Action is scheduled to begin on October 22, 2024.[90]

## II.  ANALYSIS

As the parties seeking advancement, Plaintiffs bear the burden to demonstrate, by a preponderance of the evidence, that they are entitled to advancement. *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 463–64 (Del. Ch. 2008).  "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."  *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted).

Section 145 of the Delaware General Corporation Law (the "DGCL") provides the "statutory framework for when and how a corporation may provide advancement to an officer, director, employee, or agent of the corporation." *Sassano*, 948 A.2d at 460.  Section 145(e) provides that expenses incurred by an officer or director in defending a legal proceeding, including attorneys' fees, "may be paid by the corporation in advance of the final disposition of such action . . . upon receipt of an undertaking . . . to repay such amount if it shall ultimately be

---

[90] Dkt. 126.

determined that such person is not entitled to be indemnified by the corporation . . . ." 8 *Del. C.* § 145(e). In other words, a right to advancement is, effectively, a loan. *See Advanced Min. Sys., Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ch. 1992) ("[T]he decision to extend advancement rights should ultimately give rise to no net liability on the corporation's part. The corporation maintains the right to be repaid all sums advanced, if the individual is ultimately shown not to be entitled to indemnification. Thus the advancement decision is essentially simply a decision to advance credit.").

Section 145(f) of the DGCL permits a corporation to grant advancement rights in its corporate documents or by separate contract. *See Homestore, Inc. v. Tafeen,* 888 A.2d 204, 212 (Del. 2005). Unisys provides advancement rights in Article X of the Certificate.

"'General rules of contract interpretation apply when construing the provisions of a company's charter or bylaws.'" *Centrella v. Avantor, Inc.* (*Centrella II*), 2024 WL 3249274, at \*5 (Del. Ch. July 1, 2024) (quoting *Krauss v. 180 Life Scis. Corp.*, 2022 WL 665323, at \*3 (Del. Ch. Mar. 7, 2022)). "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted). When a contract is clear and unambiguous, the court "will give effect to

the plain-meaning of the contract's terms and provisions." *Id.* at 1159–60; *see Rhodes v. bioMerieux, Inc.*, 2024 WL 669034, at \*7 (Del. Ch. Feb. 19, 2024) (explaining that Delaware courts look to "the plain meaning of the advancement provision[s]" in determining whether to award advancement (alteration in original) (internal quotation marks omitted)). "The Court will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage." *Perik v. Student Res. Ctr., LLC*, 2024 WL 181848, at \*3 (Del. Ch. Jan. 17, 2024) (internal quotation marks omitted). "This approach places great weight on the plain terms of a disputed contractual provision, and we interpret clear and unambiguous terms according to their ordinary meaning. We do not consider extrinsic evidence unless we find that the text is ambiguous." *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (footnotes and internal quotation marks omitted), *reargument denied* (Mar. 22, 2022). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Advancement is "purely permissive," but many Delaware corporations "provide for mandatory advancement as an enticement to attract qualified

23

individuals to serve as directors and officers." *Holley v. Nipro Diagnostics, Inc.*, 2014 WL 7336411, at *7 (Del. Ch. Dec. 23, 2014); *see also Homestore*, 888 A.2d at 211 (explaining that advancement is "an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service"). "Rights to indemnification and advancement are deeply rooted in the public policy of Delaware corporate law in that they are viewed less as an individual benefit arising from a person's employment and more as a desirable mechanism to manage risk in return for greater corporate benefits." *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 509 (Del. 2005).

> Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the corporation will bear the expense of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity.

*VonFeldt v. Stifel Fin. Corp.* (*VonFeldt II*), 714 A.2d 79, 84 (Del. 1998). "We eschew narrow construction of the statute where an overliteral reading would disserve these policies." *Id.* As such, Delaware policy "supports the approach of resolving ambiguity in favor of indemnification and advancement." *Miller v. Palladium Indus., Inc.*, 2012 WL 6740254, at *3 (Del. Ch. Dec. 31, 2012), *aff'd*, 72 A.3d 502 (Del. 2013) (TABLE); *accord Blankenship v. Alpha Appalachia Hldgs., Inc.*, 2015 WL 3408255, at *18 (Del. Ch. May 28, 2015). Stated differently, if there is any ambiguity in the scope of an advancement provision, the court generally errs

on the side of providing advancement. *See OrbiMed Advisors LLC v. Symbiomix Therapeutics, LLC*, 2024 WL 747567, at *4 (Del. Ch. Feb. 23, 2024).

Plaintiffs proffer three theories under which they believe they are entitled to advancement from Unisys. First, they argue that they were officers of Unisys. Second, they argue that Gilbert is entitled to advancement because he was Unify Square's President after Unisys acquired it. Third, both Plaintiffs argue that they are entitled to advancement because they served an enterprise at the request of Unisys. The court addresses each theory in turn.

### A. Plaintiffs Are Entitled to Advancement as Officers of Unisys.

First, Plaintiffs argue that they are entitled to advancement because they were officers of Unisys. The parties agree that officers of Unisys are entitled to advancement. They disagree as to whether Plaintiffs were officers.

Plaintiffs contend that they were chosen by the Board and served as Vice Presidents, and that each conveys officer status. Defendant contends that there were only two ways to become officers—election by the Board or appointment as a subordinate officer—and that neither occurred here.

The Certificate does not define "officer." The Bylaws do not expressly define officer, but they do identify categories of officers and how they are selected. Article IV of the Bylaws, titled "Officers," sets forth as follows:

25

Section 1.  Number, Qualifications and Designation

The officers of the Corporation shall be chosen by the Board of Directors and *shall be* a Chief Executive Officer, a President, *one or more Vice Presidents*, a Secretary, a Treasurer, a Controller *and such other officers as may be elected in accordance with the provisions of Section 3* of this Article IV.  Any number of offices may be held by the same person.

Section 2.  Election and Term of Office

The officers of the Corporation, except those appointed by delegated authority pursuant to Section 3 of this Article IV, shall be elected annually by the Board of Directors, and each such officer shall hold office for a term of one year and until a successor is elected and qualified, or until such officer's earlier resignation or removal.  Any officer may resign at any time upon written notice to the Corporation. . . .

Section 3.  Other Officers, Committees and Agents

The Board of Directors may from time to time elect *such other officers, which may include, at the Board's discretion*, the Chair of the Board and a Vice Chair, and appoint such committees, employees or other agents as it deems necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as are provided in these bylaws, or as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any officer or committee the power to appoint subordinate officers and to retain or appoint employees or other agents, or committees thereof, and to prescribe the authority and duties of such subordinate officers, committees, employees or other agents.[91]

The Bylaws identify two categories of officers.  First, there are officers who

are expressly identified by title.  These are "a Chief Executive Officer, a President,

---

[91] JX 112 Art. IV §§ 1–3 (emphasis added).

26

one or more Vice Presidents, a Secretary, a Treasurer, [and] a Controller."[92]  Section 1 states that these "shall" be officers.[93]  The court labels these as "mandatory officers." *See Zurich Am. Ins. Co. v. St. Paul Surplus Lines, Inc.*, 2009 WL 4895120, at *7 n.55 (Del. Ch. Dec. 10, 2009), *as revised* (Apr. 14, 2010) ("In both contracts and statutes, the term 'shall' is used to make an act mandatory."); *Homestore*, 888 A.2d at 212 (construing "shall" as contained in an advancement bylaw as "mandatory"); *see also Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *6 (Del. Ch. July 14, 2009) ("[T]he plain meaning of 'shall be advanced' is that advancement is mandatory."); *see, e.g.*, *Centrella v. Avantor, Inc.* (*Centrella I*), C.A. No. 2022-0876-NAC, at 8:24–9:2 (Del. Ch. Dec. 14, 2022) (TRANSCRIPT) ("The mandatory officers comprise a finite list of persons who 'shall be elected by the Board.'").  The second category comprises "other officers as may be elected"[94] "at the Board's discretion."[95]  These are "discretionary officers."  *See Centrella I*, C.A. No. 2022-0876-NAC, at 9:8–10 ("The discretionary officers are persons who 'the Board may elect' or the 'Board may appoint,' all in its discretion."); *see also Pulier v. Computer Scis. Corp.*, C.A. No. 12005-CB, at 16:20–19:21 (Del. Ch. May 12,

---

[92] *Id.* Art. IV § 1.

[93] *Id.*

[94] *Id*.

[95] *Id*. Art. IV § 3.

2016) (TRANSCRIPT) (contrasting a bylaw section providing that "the officers of the Corporation shall be elected by the Board of Directors and shall be," which the court described as "stat[ing] who must be an officer," against a second section stating that "the Board of Directors may also elect," which the court characterized as "permissive").

Plaintiffs do not contend that they were elected as officers by the Board or appointed by officers with authority to appoint officers. Plaintiffs argue that they were hired with the titles of Vice President and, therefore, they are officers entitled to mandatory advancement under the plain language of the Bylaws.

The Defendant contends otherwise. Defendant argues an officer is only someone who is elected by the Board or appointed as a subordinate officer. In other words, Defendant maintains that carrying a Vice President title does not equate with officer status. To reach that status, says Unisys, one must also be formally elected by the board or appointed as an officer by someone with the authority to appoint officers of the Company. Hence, Unisys argues that there are two classes of Vice Presidents, those who are officers and those who are not officers.

Defendant points to this court's transcript ruling in *Pulier*, which rejected its plaintiff's argument that anyone with the title of vice president was an officer under the bylaws at issue in that case. C.A. No. 12005-CB. There, a section titled "Principal Officers" provided that "the officers of the Corporation shall be elected

28

by the Board of Directors and shall be a Chief Executive Officer, a President, a Secretary and a Treasurer." *Id.* at 16:20–17:1. The following section, titled "Other Officers," stated that "the Board of Directors may also elect one or more Vice Presidents, Assistant Secretaries and Assistant Treasurers, and such other officers and agents, as it shall deem necessary." *Id.* at 17:2–7. The court rejected the plaintiff's contention that all vice presidents were officers by operation of the certificate alone, contrasting the mandatory language of the first section with the permissive language of the second. Because of this construction, the court explained that the second section "gives a nonexclusive list of what positions such officers might hold, which include the position of vice president. Logically, however, that language does not require the inverse inference that merely because an individual holds the title of vice president, he or she must be an officer." *Id.* at 19:13–18. The *Pulier* court reasoned that, under that construction, a vice president would only be an officer if elected by the board, and because the evidentiary record did not show that the plaintiff had been elected, the court concluded that he was not an officer. *Id.* at 18:18–19:6, 19:18–21; 20:11–12. But the *Pulier* court also opined, more broadly, that the phrases "shall be elected by the Board of Directors and shall be [enumerated positions]" and "may also elect [other positions]" unambiguously provided that "individuals only become officers of CSC through board election." *Id.* at 16:20–17:7, 19:18–21.

29

This court reached a similar result in *Centrella I*. C.A. No. 2022-0876-NAC. There, the bylaws classified officers in two groups, which the court referred to as mandatory officers and discretionary officers. The officers in the first group were identified as "Chief Executive Officer, President, principal financial officer, principal accounting officer, and Secretary." *Id.* at 8:24–9:7. The bylaws stated that these officers "shall be elected by the Board." *Id.* at 9:1–2. The discretionary officers were persons who the Board "may elect" or "may appoint," and included "a Vice President, a Treasurer, an Assistant Treasurer, or an Assistant Secretary." *Id.* at 9:8–13. The plaintiff, a Vice President, sought advancement under a bylaw requiring advancement to officers. Ruling on cross motions for summary judgment, the court concluded that, under these bylaws, a mere Vice President title did not confer officer status, but that there remained material issues of fact as to whether the plaintiff had been elected.[96] Reaching this "straightforward conclusion" under the plain language of the bylaws, the court drew no distinction between mandatory and discretionary officers in this regard: "Although there are two types of officer classes, one detail remains the same: Under the bylaws, only the board may designate an 'officer' of the company." *Id.* at 9:14–17.

---

[96] The plaintiff went to trial on a different theory and prevailed. *See Centrella II*, 2024 WL 3249274, at *5, *17.

30

Here, the language of the Bylaws differs in two respects. First, the Bylaws state that officers "shall be chosen," not "shall be elected." It is clear that the Bylaws' drafters did not intend "chosen" to mean only "elected," a word they used separately in each of the following sections. *See Sanders v. Wang*, 1999 WL 1044880, at *9 (Del. Ch. Nov. 8, 1999) (declining to add a term where other language demonstrated that the drafters "knew how to authorize this type of material alteration when they so desired"). But it is not far off. Reading Sections 1, 2, and 3 of the Bylaws together, they provide that the Board could choose directors through the two mechanisms discussed at the beginning of Section 2—election and appointment—by which the Board or its designated agent would choose an officer. Therefore, Section 1 provides that officers must be "chosen by the Board" and identifies mandatory officer positions that the Board must fill. Section 3 provides a mechanism by which the Board *may* add other types of officer positions not specified in Section 1. Sections 2 and 3 then provide the methods by which the Board chooses officers—either by election or appointment.

Second, unlike in *Pulier* and *Centrella I,* vice presidents are placed in the mandatory section of the Bylaws, indicating that this is a position to be held by an officer. Though addressing permissive officer positions, the *Pulier* and *Centrella I* courts noted that even under the mandatory language in the first section of their respective bylaws, "individuals only become officers [] through board election."

31

*Pulier*, C.A. No. 12005-CB, at 19:20–21; *accord Centrella I*, C.A. No. 2022-0876-NAC, at 9:14–17 ("[a]lthough there are two types of officer classes, one detail remains the same: . . . only the board may designate an 'officer' of the company").

Plaintiffs contend that by the plain language of Section 1, all vice presidents "shall be" officers. The Plaintiffs' argument as to the correct interpretation of the Bylaws is grounded in a reasonable person's understanding of the Bylaws and, Plaintiffs maintain, a common understanding that a Vice President is an officer. This argument chiefly relies upon *Aleynikov v. The Goldman Sachs Group, Inc.*, 2016 WL 3763246 (Del. Ch. July 13, 2016) (ORDER).

In *Aleynikov*, the plaintiff was a vice president of a subsidiary of Goldman Sachs Group, Inc. ("Goldman Parent") and sought advancement from Goldman Parent to defend against claims that Goldman Parent and the subsidiary had brought against him. The plaintiff had previously sought advancement in the federal courts to defend against criminal claims related to the same conduct. In the earlier federal advancement proceeding, the plaintiff was denied advancement. In a critical appellate ruling in that case, the Third Circuit held that, in the event the bylaw was ambiguous, the trial court could not construe the provision against Goldman Parent under the doctrine of *contra proferentem*. *Aleynikov v. The Goldman Sachs Gp., Inc.* (*Federal Aleynikov*), 765 F.3d 350, 367 (3d Cir. 2014).

In the Delaware advancement action, the court was faced with interpreting the advancement bylaw and, specifically, whether the plaintiff was an officer of the Goldman Parent subsidiary where he worked. Goldman Parent's bylaws required, in pertinent part, advancement to any "officer of . . . a subsidiary of the Corporation" and further stated that "when used with respect to a subsidiary or other enterprise that is not a corporation . . . , the term 'officer' shall include in addition to any officer of such entity, any person serving in a similar capacity or as the manager of such entity." *Aleynikov*, 2016 WL 3763246, at *1 (alterations in original). In the federal proceedings, the Third Circuit, applying Delaware law, held that the definition of officer under the Goldman Parent bylaws was ambiguous and the doctrine of *contra proferentem* could not be used to resolve the ambiguity. *Aleynikov*, 2016 WL 3763246, at *2.

In the subsequent advancement proceeding in Delaware, this court found that *Federal Aleynikov*'s rulings on ambiguity and *contra proferentem* were preclusive under principles of *res judicata*. *Id.* at *2, *7. Nevertheless, this court made clear that had it not been precluded from doing so, it would have resolved the ambiguity in the bylaw against Goldman Parent under the doctrine of *contra proferentem*. *See id.* at *6–7.

The court noted that the federal courts' conclusion that the definition of officer was ambiguous was an "implicit" finding that "[a]n individual with the title 'Vice

33

President' could reasonably conclude that he was an 'officer' who was entitled to advancement rights under the Bylaws." *Id.* at *3. The court then carefully explained how "[a] set of 'officers' that encompasses 'vice presidents' is consistent with the widespread understanding of who typically comprise the officers of an entity." *Id.* at *4.[97]

*Aleynikov* also seemingly rejected the notion that a corporation could escape its advancement obligation by not engaging in the formal act of electing a vice president as an officer. "A reasonable individual with the title 'Vice President' would not think that he could not be an officer simply because his offer letter did not refer to the board of directors or a similar governing body having taken formal action to appoint him." *Id.* at *6; *see id.* ("A person like Aleynikov, who received the title

---

[97] For example, vice presidents are considered officers under federal securities laws. *See* 17 C.F.R. 240.3b-2 ("The term officer means a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated."). As *Aleynikov* explained, the Rules defining "officer" solely under Section 16 of the Securities Exchange Act of 1934 (the "Exchange Act") were amended in 1991 to provide that officer means "an issuer's president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function . . . [or] any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer." *Id.* at *5 (quoting 17 C.F.R. § 240.16a-1); *see also id.* (explaining that "[t]he New Deal-era definitions proved too expansive for purposes of reporting short-swing profits," motivating the narrowing of Section 16's applicability from "officers" to "executive officers"). Therefore, it appears that by virtue of their titles alone, Plaintiffs would be officers under the Exchange Act. *See Aleynikov*, 2016 WL 3763246, at *5 (noting that though the amendments "narrow[ed] the coverage of the short-swing provisions," "other officers were still officers").

of 'Vice President' in an offer letter signed by another 'Vice President,' therefore could reasonably believe that he had been given an officer position.").[98] Former Chief Justice Strine, while a Vice Chancellor, offered a similar view: "The bylaws specifically indicate that there can be more than one vice president. . . . [A]nd when the bylaws of the company let officers, key officers make other officers, I think it's pretty, to me—there's no real rebuttal evidence." *Kale v. Wellcare Health Plans, Inc.*, C.A. No. 6393-VCS, at 65:1–3, 65:17–20 (Del. Ch. June 13, 2011) (TRANSCRIPT). Both cases emphasized that any ambiguity in the construction of the bylaws should be construed in favor of the party seeking advancement. *See id.* at 67:23–68:2 ("[W]hen a document can be read in two reasonable ways, then you read it in favor of the party seeking advancement or indemnification when it's not a

---

[98] Gilbert's offer letter was signed by Tim Golden, the Director of Global Talent Acquisition, and copied Eric Hutto, the President and Chief Operating Officer, and Ebrahimi, the then Senior Vice President and Chief Human Resources Officer. *See* JX 39 at GM_DelLit_0000237. Ebrahimi signed Gilbert's employment agreement. *See* JX 65 at GM_DelLit_0000024. That agreement represented that the "Board . . . determined that it is in the best interests of the Company and its stockholders to assure that the Company will have [Gilbert's] continued dedication" and that "IN WITNESS WHEREOF, . . . pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf . . . ." *Id*. at GM_DelLit_0000011, GM_DelLit_0000024. McGarvey's offer letter was signed by a Human Resources Manager, not a Vice President. JX 47 at 3. However, Gilbert specifically requested that Unisys bring over "my DWP CTO" and McGarvey was brought on to fulfill a similar role. JX 164 at GM_DelLit_0000244; Tr. 71:18–20 (McGarvey); Thomson Dep. at 34:25–35:2; Tr. 186:23–187:1 (Thomson). Additionally, McGarvey's interviews were with Hutto and Lisa Madion, the Senior Vice President of Corporate Services. JX 43. While the evidence is weightier with respect to Gilbert than McGarvey, the difference is immaterial based on the Bylaws in this case.

specifically negotiated agreement."); *Aleynikov*, 2016 WL 3763246, at *5 ("The doctrine of *contra proferentem* appropriately holds Goldman Parent to the promises it implicitly made 'to parties who did not participate in negotiating' the Bylaws.").

There is a tension between the transcript rulings in *Pulier* and *Centrella I*, which held that an election was a pre-requisite for officer status, and *Aleynikov* and *Kale*, which took a broader view and relied on *contra proferentem*. Admittedly, some of the discussion in *Aleynikov*, despite its careful and detailed analysis, is dicta. But so are *Pulier* and *Centrella I* on the issue of whether a bylaw that denominates Vice Presidents as mandatory officers precludes persons with that title from receiving mandatory advancement unless the board of directors formally chooses them as officers or expressly designates another officer to do so, as both resolved whether discretionary officers were entitled to advancement.

A reasonable person standing in the shoes of a prospective indemnitee like Gilbert or McGarvey ought to be able to look at the advancement provisions in the Certificate and the description of officers in the Bylaws and clearly determine whether they are entitled to advancement. *See Aleynikov*, 2016 WL 3763246, at *3 ("Goldman Parent drafted its Bylaws unilaterally. Goldman Parent therefore was in the best position to remove any ambiguity [and] should be held responsible for the reasonable expectations created by its Bylaws."); *Stockman*, 2009 WL 2096213, at *5 ("The *contra proferentum* approach protects the reasonable expectations of

36

people who join a partnership or other entity after it was formed and must rely on the face of the operating agreement to understand their rights and obligations when making the decision to join."). "[A]dvancement provisions [serve] as an inducement which promotes the same salutary public policy that is served by indemnification: attracting the most capable people into corporate service." *Homestore*, 888 A.2d at 218. Were a prospective officer to read a corporation's certificate and bylaws, they should be able to rely on a reasonable interpretation thereof. One can easily imagine a prospective officer reading the Bylaws, seeing that vice presidents "shall" be officers, and concluding that they would be an officer entitled to advancement.[99] Here, consistent with the persuasive reasoning in *Aleynikov*, the court finds that reasonable individuals who are hired as Unisys Vice Presidents by persons with authority to bestow the title can reasonably conclude under the Bylaws that they are

---

[99] That is, as Defendant highlights, not what happened here. Neither of the Plaintiffs testified that they considered the availability of advancement or indemnification in deciding to join Unisys, and both testified that they have never read the Certificate or Bylaws. Tr. 5:11–15 (Gilbert); *id.* at 68:18–22 (McGarvey). But "because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party," and whether the Plaintiffs read the Certificate or Bylaws is beside the point. *Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017); *cf. Pellaton v. Bank of New York*, 592 A.2d 473, 477 n.6 (Del. 1991) ("[A] person signing a contract, having the capacity and the opportunity to read its contents, cannot avoid the contract on the ground that he/she signed the contract without reading it.").

officers of the Company.  Plaintiffs' reading of Article IV is a reasonable one.  Thus, at a minimum, the Bylaws are ambiguous.

Plaintiffs contend that in the advancement context, ambiguity must be construed in their favor under the doctrine of *contra proferentem.  See Stockman*, 2009 WL 2096213, at *5 (explaining that "the onus is on the drafter to be clear" because "it is critical that the governing instruments of entities be interpreted consistently and that they be applied in a predictable manner" and concluding that "any ambiguities in [the Certificate or Bylaws] should be resolved in favor of the reasonable expectations of [the Plaintiffs] regarding their indemnification and advancement rights").  Plaintiffs are correct.  That Unisys doled out Vice President titles to dozens of employees is of its own doing.  Unisys "easily could have clarified whether or not the title of 'Vice President' was an officer title for purposes of advancement and indemnification."  *Aleynikov*, 2016 WL 3763246, at *5; *see also Kale*, C.A. No. 6393-VCS, 64:9–10 ("[I]f companies wish to be clear, then you say 'officer will mean.'").  Unisys did not.  Therefore, the ambiguity must be resolved in Plaintiffs' favor.  *Stockman*, 2009 WL 2096213, at *5; *see also Aleynikov*, 2016 WL 3763246, at *6 ("Applying the doctrine of *contra proferentem* and holding an entity to the presumptive implications of the title it chooses to bestow facilitates the summary disposition of advancement proceedings.").

Therefore, the court concludes that Plaintiffs were officers of Unisys, and are entitled to advancement as such.

## B. Gilbert's Service as President of Unify Square Entitles Him to Advancement.

Plaintiffs next argue that Gilbert served as Unify Square's President at Unisys's request, and that he is being sued because of his service in that capacity.[100] Defendant argues that it did not request that service and is not suing Gilbert by reason of his having served as the President of Unify Square.

### 1. Gilbert served as the President of Unify Square at Unisys's request.

Defendant argues that Gilbert did not serve as the President of Unify Square at Unisys's request because it was the Unify Square Board, not Unisys, that technically elected Gilbert to that position. Plaintiffs counter that Defendant's argument places form over function and must be rejected.

Plaintiffs analogize this situation to that in *VonFeldt II*. 714 A.2d 79. There, Mr. VonFeldt served as a director, employee, and officer of Stifel Nicolaus Corporation ("SNC"), a wholly owned subsidiary of Stifel Financial Corporation ("Stifel Financial"). *Id.* at 80. At the trial level, this court denied VonFeldt's claim

---

[100] Plaintiffs did not raise this issue in their motion for judgment on the pleadings. They added this theory only in response to materials produced in discovery after the court denied the motion for judgment on the pleadings.

for advancement because he failed to carry his evidentiary burden to establish that he was serving SNC at the request of Stifel Financial. *VonFeldt v. Stifel Fin. Corp.* (*VonFeldt I*), 1997 WL 525878, at *1 (Del. Ch. Aug. 18, 1997), *aff'd in part*, *rev'd in part*, 714 A.2d 79 (Del. 1998). On appeal, the Supreme Court reversed and held that "as a matter of law, the request to serve as an officer and employee of a wholly-owned subsidiary is inferred from the director's election to the subsidiary's board." *VonFeldt II*, 714 A.2d at 85.

Defendant contends *VonFeldt II* is distinguishable from this case. There, Stifel Financial, the parent, had elected VonFeldt as a director, whereas here, Gilbert was not among the three directors that Unisys elected to the Unify Square Board, which in turn selected Gilbert as Unify Square's President.[101] This distinction does not undermine *VonFeldt II*'s application in this case.

Where, as here, a parent corporation acquires a target corporation, elects a new board for the target consisting only of the parent's employees, and that board appoints another employee as the target's new president—all in the same day—the court infers that the new president's service is at the request of the parent corporation. "Although the facts in this case are different, the fundamental reasoning

---

[101] Defendant also contends that VonFeldt was being sued only by reason of his service of SNC, not Stifel Financial, while Gilbert is being sued by reason of conduct that implicates his service of both Unify Square and of Unisys. This is true—but it is sufficient that Gilbert is being sued by reason of, at least partially, his service of Unify Square.

of [*VonFeldt II*] applies." *Zaman v. Amedeo Hldgs., Inc.*, 2008 WL 2168397, at \*19 (Del. Ch. May 23, 2008) (holding, based on the specific facts of that case, that the plaintiffs were entitled to advancement because they had been empowered by the companies' sole beneficial owner).

Even if the distinction between this case and *VonFeldt II* prevents the court from inferring Gilbert served as an officer as a matter of law, Gilbert has met his evidentiary burden as a matter of fact. The timeline of events leading to Gilbert's selection as Unify Square's President is crucial. Three closely related events occurred on June 3, 2021: (1) Unisys closed the acquisition of Unify Square;[102] (2) Unisys immediately appointed three of its employees to the Unify Square Board;[103] and (3) the Unisys-appointed directors appointed Gilbert as President of Unify Square by unanimous written consent.[104] Then, the very next day, Altabef, Gilbert, and Ebrahimi led an all-hands meeting of Unify Square's employees to discuss the integration of Unify Square into Unisys and, specifically, the DWS business unit.[105] The unmistakable conclusion to draw is that Gilbert's selection as Unify Square's President was hard-wired into Unisys's process of acquiring Unify Square. This

---

[102] JX 73.

[103] Tr. 175:15–19 (Thomson).

[104] JX 74.

[105] JX 75.

conclusion is further bolstered by the facts that Gilbert was the head of the business unit into which Unify Square was to be integrated,[106] Gilbert had recommended the acquisition and played a role in the acquisition process,[107] and Gilbert led the post-acquisition integration process as well.[108] The contrary conclusion—that the Unify Square Board, comprising three Unisys employees, decided to independently appoint Gilbert as its President without any direction from Unisys—would require the court to suspend disbelief, both as a general matter and on the specifics of this record. The court finds that Gilbert served Unify Square at the request of Unisys.

### 2. Gilbert is being sued by reason of his having served as the President of Unify Square.

Defendant argues that it is suing Gilbert because of his alleged theft of Unisys's information, not by reason of his having served as the President of Unify Square. Defendant argues that the Pennsylvania Action alleges theft of Unisys trade secrets, not Unify Square trade secrets. Defendant highlights that, at the time Plaintiffs allegedly downloaded files and conveyed them to Atos, Unify Square had been merged into Unisys for over a year and Unisys had a direct entitlement to those

---

[106] *Id.*

[107] JX 54 at 3–4; Tr. 28:12–29:10 (Gilbert).

[108] Tr. 175:6–8 (Thomson).

documents and trade secrets. Defendant also alleges that Gilbert and McGarvey misappropriated information wholly unrelated to Unify Square.

Plaintiffs counter that Gilbert played a critical role in the integration of Unify Square into Unisys after the acquisition, and that some of the materials Defendant alleges Plaintiffs misappropriated related to that process. Plaintiffs also emphasize that, in line with the broader policy behind advancement, courts have broadly construed the "by reason of the fact" analysis and erred in favor of advancement.

"Under Delaware law, the 'by reason of the fact' standard, or the 'official capacity' standard, is interpreted broadly and in favor of indemnification and advancement." *In re Genelux Corp.*, 2015 WL 6390232, at * 4 (Del. Ch. Oct. 22, 2015) (cleaned up); *accord Centrella II*, 2024 WL 3249274, at *12. "An individual is not sued 'by reason of the fact' that he or she is a director [or officer] simply because certain allegations against the individual arguably give rise to breach of fiduciary duty claims." *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1016 (Del. Ch. 2007) (footnote omitted). Rather, one is sued by reason of the fact of one's service in a covered capacity only "if there is a nexus or causal connection between any of the underlying proceedings . . . and one's official corporate capacity . . . without regard to one's motivation for engaging in that conduct." *Homestore*, 888 A.2d at 214. The focus of the inquiry, in these circumstances, is whether the allegedly illicit "scheme is alleged to have employed the corporate powers (or, for

43

example, confidential inside information acquired through the corporate status) conferred upon the officer by virtue of his status." *Perconti v. Thornton Oil Corp.*, 2002 WL 982419, at \*7 (Del. Ch. May 3, 2002). [109] Where, as here, an action alleges misappropriation or misuse of the corporation's confidential information, "allegations relating to post-separation use of confidential information learned pre-separation are 'by reason of the fact' of Petitioners' positions." *Ephrat v. medCPU, Inc.*, 2019 WL 2613281, at \*7 (Del. Ch. June 26, 2019).

This court has found advancement and indemnification rights triggered by covered persons' post-termination conduct when the challenged conduct "involved the misuse of confidential information that the director or officer obtained in that role." *Perik*, 2024 WL 181848, at \*6; *see, e.g.*, *Ephrat*, 2019 WL 2613281, at \*7–8 (finding that the plaintiffs were entitled to advancement in connection with claims alleging that "confidential information and trade secrets" were "still in their possession after [their] separation from employment with medCPU" and applying

---

[109] *Compare Perconti*, 2002 WL 982419, at \*7 n.35 (explaining that a hypothetical criminal suit alleging that the plaintiff "had randomly robbed one of Thornton's gas stations on a Saturday night" would have involved his employer, but that indemnification of his expenses would not be required "because none of his corporate powers or other attributes of his corporate status were used in, or were necessary for, the commission of the robbery as described"), *with id.* at \*6–7 (finding that indemnification was required based on the facts of that case because the misconduct alleged "demonstrates a course of abuse of his corporate position" because "it was [the plaintiff's] status as officer that enabled him to embezzle").

the same reasoning to the plaintiffs' alleged violations of non-competition agreements (alteration in original) (internal quotation marks omitted)). The inquiry is not focused on when the individual seeking advancement allegedly misused the information—rather, the court looks to when and in what capacity they originally acquired it.

Under our law, the relevant point of inquiry is not when Gilbert allegedly misappropriated information in connection with leaving Unisys, but rather when he first learned that information and in what capacity he originally aided in its development. Gilbert did not learn about that information for the first time when he was leaving Unisys—he was already aware of it from his day-to-day responsibilities, which included running DWS and integrating Unify Square as its President.[110] Had Gilbert been alleged to have taken and misappropriated trade secrets related to Unify Square from Unify Square while that entity still existed, an ensuing action against him would have been by reason of his having learned those secrets from his service as President of Unify Square. That Unisys subsequently merged Unify Square out

_____

[110] A declaration that Unisys submitted in support of the motion for a temporary restraining order in the Pennsylvania Action explained that "Unisys prepared documentation related to the design, implementation, and strategies of Unify Square's platform," "[b]ased on their roles, Mr. Gilbert and Mr. McGarvey were intimately familiar with these documents," "[b]oth Mr. Gilbert and Mr. McGarvey had access to this information during the course of their employment with Unisys and were aware of the highly confidential and sensitive nature of these materials they took," and "[w]e consider these materials to be our trade secrets." JX 117 ¶¶ 13–14, 16–17.

of existence does not alter the capacity in which Gilbert first had access to this information.

The complaint in the Pennsylvania Action identifies a broad swath of information as trade secrets, including information specific to Unify Square and its integration into Unisys's DWS business unit.[111] Unisys's allegations as to what information constitutes a trade secret is not limited to documents. Nor does the complaint in the Pennsylvania Action limit its claims and allegations to periods when Gilbert was not the President of Unify Square. Indeed, Unisys points to a January 2023 conversation between Gilbert and an Atos Senior Vice President as evidence of Gilbert's intent to misuse information that he obtained while at Unisys:

> Gilbert then made clear to [an Atos SVP] that he would use his knowledge from Unisys to push Atos forward, stating that he "spent [the] last 2 years in the model Atos is trying to get to, so [he] know[s] what works and doesn't. Have to now show [Atos's CEO] the same."[112]

---

[111] For example, the original and operative complaints in the Pennsylvania Action both allege that "several downloaded documents include confidential information related to the architecture design for Unisys'[s] communications platform as well as internal presentations that discuss the integration of Unify Square with Unisys." JX 118 ¶ 49; JX 125 ¶ 60; *see also* JX 117 ¶ 17 (averring that "strategies relating to the incorporation of Unify Square" into the DWS Platform are trade secrets). "The Court must seek to discern the true nature of the [] claims" in the Pennsylvania Action. *Imbert v. LCM Int. Hldg. LLC*, 2013 WL 1934563, at *6 (Del. Ch. May 7, 2013); *Gasgarth v. TVP Invs., LLC*, C.A. No. 2018-0621-JTL, at 72:3–8 (Del. Ch. Dec. 7, 2018) (TRANSCRIPT) ("[T]he fact that we usually look at the pleadings doesn't prevent the Court from looking at the overall litigation scenario. Nor does it prevent the Court from considering discovery in the rare case, such as this one, where there actually was discovery and a trial record."), *aff'd*, 216 A.3d 869 (Del. 2019) (TABLE).

[112] JX 125 ¶ 52.

Unisys seeks injunctive relief against Gilbert by the "actual and threatened misappropriation" of information acquired in that two-year span, a period that included Gilbert's term as President of Unify Square.[113]  Admittedly, this court cannot presume to know how the Pennsylvania Action will play out or how Unisys will present its case.  But based on the Pennsylvania complaint and the affidavit filed in support of a temporary restraining order, the court cannot conclude that Gilbert was not made a party to that proceeding by reason of the fact that he was an officer of Unify Square, at least not in part.  To be sure, Plaintiffs have not made a compelling showing on this point.  But in this circumstance, the court should err on the side of awarding advancement.  *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *7 (Del. Ch. May 30, 2008) ("The 'by reason of the fact' standard, or the 'official capacity' standard, is interpreted broadly and in favor of indemnification and advancement."); *see Holley*, 2014 WL 7336411, at *9 ("In advancement cases, the line between being sued in one's personal capacity and one's corporate capacity generally is drawn in favor of advancement with disputes as to the ultimate entitlement to retain the advanced funds being resolved later at the indemnification stage.").

---

[113] *Id.* ¶ 56; *see id.* ¶¶ 74–75, 86–87, Prayer for Relief ¶ 1.

Defendant notes that the Pennsylvania Action alleges that Gilbert took much more information than that relating to Unify Square, such as trade secrets relating to Mobinergy, another company Unisys acquired during Plaintiffs' tenure at Unisys. Unisys emphasizes that Gilbert did not hold an elected officer position when obtaining Mobinergy information. Unisys argues, by parity of reasoning, that this shows that its claims against Gilbert had nothing to do with his service as Unify Square President. Since holding a position at Mobinergy was not necessary for Plaintiffs to access that information, Defendant contends that neither was it necessary for Gilbert to have held an officer position at Unify Square to acquire its trade secrets.

As Senior Vice President of DWS, Gilbert would have the same access to this information by virtue of his position regardless of whether he had been appointed President of Unify Square. But while his time as Unify Square's President was not necessary for him to have access to the information he allegedly stole, it is a sufficient nexus for advancement. Having multiple sources of the same information does not diminish Gilbert's right to advancement of the costs of defending a suit alleging that he misappropriated that information. *See Brown v. LiveOps, Inc.*, 903 A.2d 324, 330 (Del. Ch. 2006) (concluding that the plaintiff was entitled to advancement where the "gravamen of the underlying complaint is that [plaintiff] had access to proprietary information by reason of the fact that he was a director and

48

officer of [the company] and that he wrongly used that information for his personal benefit"); *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1052, 1054 (Del. Ch. 2014) (observing that the plaintiff's alleged misappropriation of confidential and proprietary information "learned during his time as a director and officer underlie nearly all of the claims" asserted against him in the underlying dispute and concluding that plaintiff was entitled to advancement "by reason of" his former role as a director or officer); *cf. Perik*, 2024 WL 181848, at *6 (explaining that "claims must concern confidential information obtained through their service as a director or officer" and observing that its plaintiff did not appear to have obtained the relevant information by reason of his covered service).

Therefore, the court concludes that Gilbert is being sued by reason of his service of Unify Square, where he served at the request of Unisys, and is entitled to advancement under Section 2(a) of Article X of the Certificate.

### C. Gilbert and McGarvey Served as Employees of an Enterprise at Unisys's Request.

Both Plaintiffs argue that they are entitled to advancement by reason of their service to the DWS business unit. Specifically, Plaintiffs contend that DWS is an enterprise under the terms of the Certificate, that they served DWS at the request of Unisys, and that they are entitled to advancement because they are being sued by reason of that service. Defendant does not contest that Plaintiffs served DWS at its

request and are being sued by reason of their having served DWS. Instead, Defendant argues that DWS is not an enterprise.[114]

The pertinent provision of the Certificate provides for mandatory indemnification of and advancement to each person sued by reason of the fact that the person "is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans."[115]

This provision is broad, almost directly mirroring the language of 8 *Del. C.* § 145(a) and 8 *Del. C.* § 145(e), with one obvious difference. Sections 145(a) and (e) of the DGCL are enabling provisions. *Kaung*, 884 A.2d at 509 ("Section 145 of the DGCL vests Delaware corporations with the capacity to protect their present and former corporate officials from expenses incurred in connection with litigation and other legal proceedings."). They create no requirements or obligations for a corporation. *Compare* 8 *Del. C.* § 145(e) (providing that expenses incurred by "persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise

---

[114] *See* Def.'s Post-Trial Answering Br. 25 (arguing that DWS is not an enterprise in part because "any employee of a corporation is also necessarily an employee of some subcomponent of the corporation").

[115] JX 1 Art. X § 2(a).

*may* be so paid upon such terms and conditions, if any, as the corporation deems appropriate" (emphasis added)), *with id.* § 145(c)(1) (mandating that "[t]o the extent that a present or former director or officer of a corporation has been successful on the merits . . . such person *shall* be indemnified" (emphasis added)); *see Homestore*, 888 A.2d at 212 ("The advancement authority conferred by section 145(e) is permissive."); *Miller*, 2012 WL 6740254, at *3 ("The Delaware General Corporation Law allows for, but does not require, advancement. . . . [A]bsent a bylaw or contractual provision that makes advancement mandatory, Delaware law leaves the decision to advance expenses to the business judgment of the board.").

Sections 145(a) and (e) provide tools to corporate drafters—ones that drafters need not and often do not use to the fullest extent possible. "Corporations do not typically extend mandatory advancement rights to employees and agents, instead reserving such rights for directors and officers appointed by the directors." *Sassano*, 948 A.2d at 460. "Yet, here, although not required by Delaware law, the [Certificate's] drafters went out of their way to do just that." *Centrella II*, 2024 WL 3249274, at *6. As this court recently observed in *Centrella II*, one "way to communicate 'to the fullest extent under the law' would be simply to copy relevant portions of the indemnification and advancement statute into the [Certificate], but change the statute's permissive language to be mandatory. The drafters of the [Certificate] seem largely to have adopted this approach . . . ." *Id.* at *6 n.77. So

too here. *Compare* 8 *Del. C.* § 145(e) (providing that expenses incurred by "persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise *may* be so paid upon such terms and conditions, if any, as the corporation deems appropriate" (emphasis added))*, with* JX 1 Art. X § 2(a) (providing that "Each person who [] is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, . . . *shall* be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law . . . .  The right to indemnification . . . *shall* include the right to be paid by the Corporation the expenses incurred in defending any such proceeding . . . ." (emphasis added)).  The language of Sections 145(a) and (e) is permissive and sets the outer limits of what a corporation can do.  By almost directly copying that language into the Certificate and making it mandatory, the drafters have communicated a clear intent to provide extremely broad advancement and indemnification rights.

With the issue now framed, the question is whether DWS is an enterprise.  The parties' positions, as analyzed below, are succinctly stated as follows:  Plaintiffs contend that an enterprise is an organization with a business purpose, and that an

enterprise may exist within an entity, whereas Defendant argues that an enterprise must be a separate legal entity external to Unisys.

Defendant's argument relies on the interpretive canon *ejusdem generis*, which "applies when there is an enumeration or listing of specific things, followed by more general words relating to the same subject matter, in which case the general words are interpreted as meaning things of the same kind as the specific matters to which the parties refer." 11 Williston on Contracts § 32:10 (4th ed.). Specifically, Defendant contends that an enterprise must be an entity because it follows a list of entity types.[116]

---

[116] Defendant also argues that accounting principles support its interpretation of enterprise. Defendant's expert, R. Harold Schroeder, explained that segment reporting pursuant to the Financial Accounting Standards Board's ("FASB") Topic 280 provides investors with information about components of a reporting corporation. Because these segments are part of the reporting for the reporting entity, "[r]eportable segments are just components, in effect, of the reporting entity." Tr. 206:16–17 (Schroeder). Defendant argues that DWS is a reportable segment of Unisys, a reportable segment is part of the reporting entity, and that a reporting segment is, therefore, not an enterprise. But merely because DWS is a reportable segment of Unisys does not mean it is not an enterprise, and Unisys did not provide any reason why a reportable segment could not be an enterprise.

Schroeder also explained that FASB used to refer to these segments as a "segment of a business enterprise" and the phrase "public business enterprise," abbreviated as "enterprise," to describe reporting entities. *Id.* at 207:9–209:5, 211:9–17 (Schroeder). But Defendant does not show why historic FASB rules should be the touching point for determining the meaning of the word enterprise. Additionally, FASB itself no longer uses the word "enterprise," instead having fully transitioned to the more precise "entity." *Id.* at 208:19–23 (Schroeder).

But as Plaintiffs note, the canon of *ejusdem generis* is a secondary interpretive rule which the court need not reach and, in any event, its application here does not counsel the conclusion Defendant proffers.  Although some of the forms referenced, like "corporation" and "trust" are distinct legal entities, others, like "joint venture" and "employee benefit plan," are not definitionally so.  Even when applied, the canon of *ejusdem generis* "will not preclude the inclusion of things not of the same class or kind when it appears the parties so intended."  11 Williston on Contracts § 32:10 (4th ed.).  Conducting a joint venture or managing an employee benefit plan as a separate entity may be a prudent course of action, and that is the course Unisys took with respect to each.[117]  But a "joint venture" merely describes a multi-party undertaking of a common business goal—it is not a type of entity.  *Warren v. Goldinger Bros.*, 414 A.2d 507, 509 (Del. 1980) (identifying the elements of a "joint venture" as "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained" (internal quotation marks omitted)); *Sheppard v. Carey*, 254 A.2d 260,

---

[117] Tr. 149:5–11 (Thomson).

263 (Del. Ch. 1969) ( "A joint adventure is not created by operation of law.[118]  It is derived from agreement of the parties but that agreement may be expressed or it may be implied. . . .  No particular formality is required for the establishment of such a relationship."  (citations and internal quotation marks omitted); *see, e.g.*, *id.* at 263–64 (finding that the parties who acted in concert to acquire a corporation, including timing other business dealings and borrowing funds together to have on hand the necessary capital, were "engaged in a joint enterprise").  This court has, similarly, treated as an enterprise an organization that was not, itself, a separate legal entity.  *See Sassano*, 948 A.2d at 464, 470 (concluding, post-trial, that a business unit that was an "unincorporated, non-legal entit[y] with no employees, no payroll, and no revenue of any sort" was an "enterprise").  Had the drafters of the DGCL or the Certificate intended "enterprise" to mean separate legal "entity," one would expect them to have used the word "entity"—and omitted "joint venture."  *See, e.g.*, *Aleynikov*, 2016 WL 3763246, at *1 (noting that the bylaws of the company provided that "when used with respect to a Subsidiary or *other enterprise that is not a*

---

[118] The *Sheppard* court used, interchangeably, the phrases "joint venture," "joint adventure," and "joint enterprise."  "Joint venture" is the modern usage.  *Compare Wah Chang Smelting & Ref. Co. of Am. v. Cleveland Tungsten Inc.*, 1996 WL 487941, at *3 (Del. Ch. Aug. 19, 1996) (citing *Sheppard* for the proposition that "Joint ventures do not arise by operation of law."), *with J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499 (Del. Ch. 1959) (discussing the contours of "joint adventures"); *see also Wah Chang*, 1996 WL 487941, at *4 (identifying *J. Leo Johnson* as recognizing "a broad definition of 'joint venture'" that *Warren* subsequently distilled into elements).

*corporation* . . . , the term 'officer' shall include in addition to any *officer of such entity*, any person serving in a similar capacity . . . ." (alteration in original) (emphasis added)). Instead, looking to the plain meanings of the words chosen and forgone, it is apparent, consistent with *Sassano*, that a more expansive meaning than "entity" was intended. This is in accord with the broad nature of Sections 145(a) and (e) as enabling provisions that set the outside scope of what a corporation can do. Specifically, if a corporation wanted to provide advancement or indemnification rights to employees of an inter- or intra-entity enterprise, Sections 145(a) and (e) permit it to do so. Unisys was not required to adopt an advancement provision mirroring the statutory limits, but it did.

Defendant's contention that an "other enterprise" must be external to Unisys is similarly unavailing. The word "another" before "corporation" serves to set apart the advancing corporation from other corporations, and in Section 145, the word "other" before "enterprise" emphasizes its broad definition and role as a list-ending catch-all. The caselaw also demonstrates that an enterprise need not be external to the advancing entity. *See, e.g.*, *VonFeldt II*, 714 A.2d at 85–86 (finding that a wholly owned subsidiary was an "other enterprise[]"). To accept Defendant's reading of the statutory language would frustrate and unnecessarily limit the scope of persons eligible for potential advancement, preventing corporations from providing advancement rights to persons serving within the corporate structure. *See id.* at 84

56

("We eschew narrow construction of the statute where an overliteral reading would disserve these policies.").

Defendant further argues that Plaintiffs' proposed definition of enterprise is overly broad, and over-inclusive. The court does not, however, need to accept Plaintiffs' proffered definition to conclude that DWS is an enterprise. Rather, by way of comparison to what this court found was an enterprise in *Sassano*, regardless of where the line is drawn, DWS falls on the "enterprise" side. A discussion of that case is apt here.

In *Sassano*, CIBC World Markets Corp.'s ("CIBC") bylaws extended advancement rights to "officers with management supervisory functions and directors" and "those who serve another corporation, partnership, joint venture, trust or other enterprise at the request of [CIBC], and are sued by reason of their office or service." 948 A.2d at 460 (alteration in original) (internal quotation marks omitted). The *Sassano* court's core holding was that the plaintiff was entitled to advancement because he was a nominal officer of CIBC with management supervisory functions. But the *Sassano* court also opined that, had he received his title from the strategic business unit ("SBU") in which he served, he would have been entitled to advancement because he was being sued by reason of his officer position with or service of that "enterprise."

Defendant minimizes this portion of *Sassano* as an alternative holding that turned on the specific question of whether CIBC or the World Markets SBU ("World Markets") had conveyed the Managing Director title on the plaintiff. The court found, after trial, that CIBC had conveyed Sassano's officer title, entitling him to advancement as a CIBC officer. The court then explained that, even if World Markets had conveyed the title, Sassano would have been entitled to advancement because World Markets was an enterprise, and that if Sassano had received his title from World Markets, he would have served as an officer of that enterprise and been sued in that capacity. Defendant argues that the alternative holding stated only that, were the *Sassano* court to agree that World Markets had conveyed Sassano's title, it would *then* have to find the World Markets was an enterprise.

Defendant misreads *Sassano*'s alternative holding. The court concluded that World Markets could not, as a factual matter, have conferred an officer title. *Id.* at 464–65. But it also unambiguously stated that "[c]learly World Markets is, if not a legal entity, an 'enterprise.'" *Id.* at 470. World Markets was an enterprise even though it could not have conveyed a title. This is best demonstrated by the *Sassano* court's description of its conclusion as "more tenable than CIBC's, which would have this court hold that Wealth Management exists at two extreme ends of a spectrum—substantive enough to confer officer titles to individuals, but not substantive enough to be an 'enterprise.'" *Id.* at 470. In other words, the *Sassano*

58

court concluded that something may lack the capacity to convey a title and still constitute an enterprise. It *then* concluded that, were Sassano's title to have been conveyed by World Markets instead of CIBC, thereby disqualifying Sassano for advancement as a CIBC officer, he nevertheless would have been entitled to advancement by reason of his position as a World Markets officer under those facts, because World Markets was an enterprise. In sum, *Sassano* found that World Markets was an enterprise irrespective of whether it had or could grant Sassano his title.

To determine whether DWS is an enterprise, it is instructive to discuss what led the *Sassano* court to conclude that World Markets was an enterprise. In that case, Canadian Imperial Bank of Commerce ("Canadian Imperial") had operating subsidiaries in every country in which it did business. CIBC was Canadian Imperial's registered broker-dealer for its business in the United States. Canadian Imperial did not, however, do business by country. Instead, it organized its global operations and marketing into SBUs that were structured along product lines. Divisions within the same Canadian Imperial subsidiary might belong to different SBUs. For example, CIBC had a Private Client Services division, which operated under the broader Wealth Management SBU, and an Investment Banking division, which fell within World Markets. The court further observed that "[a]lthough there seems to have been an organizational hierarchy within Wealth Management and

World Markets, these SBUs were unincorporated, non-legal entities with no employees, no payroll, and no revenue of any sort." *Id.* at 464. Looking at the whole picture presented of World Markets after trial, the *Sassano* court concluded that World Markets was an enterprise.

The operations of Unisys are strikingly similar to those of Canadian Imperial. As Altabef outlined, "we have subsidiaries for specific countries to doing [sic] business," but "we don't really think of the business in terms of subsidiaries."[119] Instead, Altabef explained that "what is important to the company are the operating entities in which the company does business. Whether it is our finance team, our legal team, any of the four business units. That is the way we think of the company."[120] Like Canadian Imperial, Unisys (post-Project Minerva) organized its business into international, product centered units that operated as one, despite fragmentation between different legal entities in different jurisdictions.

Unisys argues that DWS was not an enterprise because it could not, for example, hire employees or enter into contracts.[121] But an enterprise need not have those functions. As the *Sassano* court found, World Markets was an enterprise

---

[119] Altabef Dep. at 108:9–10, 109:5–6. Unisys has "70 or so subsidiaries." *Id.* at 108:3.

[120] *Id.* at 109:14–19.

[121] Tr. 23:19–21, 47:22–24, 147:18–148:4.

despite not having a formal legal existence, employees, payroll, "revenue of any sort," or the ability to convey an officer title. 948 A.2d at 464–65, 470.

In this case, it is straightforward to conclude that each of Unisys's reportable segments operated as a standalone enterprise. In determining that each of the segments should be reported separately, Unisys observed: "Although there are shared Cloud and Security components between the three core BUs, the rest of the solutions that the BUs offer is indigenous to the specific BU that offers the solution. The go-to-market, margin profile and delivery mechanisms are all unique."[122] Unisys envisioned that "[t]he distribution method will be unique between the BUs. Use of Inteliserve for DWS, CloudeForte for C&I and ClearpathForward Operating system as the base for CPF will all be unique per BU."[123] More broadly, Unisys intended "to run the business by Business Unit (BU) and that there will be senior leadership responsible for each BU" and that "the compensation structure will be primarily aligned to BU results (*i.e.* each segment manager will 'own' a discrete P&L and be compensated based on the results of that P&L) and their contribution to the total company."[124] And, as executed, these business lines functioned in many ways like standalone businesses. DWS "acted like a business within a business,

---

[122] JX 22 at UNISYS_ADV_00028062.

[123] *Id.* at UNISYS_ADV_00028063.

[124] *Id.* at UNISYS_ADV_00028060–61.

61

meaning that we were organized, we had marketing that was very specific to DWS. We would show up in presentations specifically as Digital Workplace Solutions. We would -- we had our own P&L which my compensation was directly tied to."[125] The segments treated each other like separate enterprises, with "[i]ntersegment sales and transfers [] priced as if the sales or transfers were to third parties."[126] Unisys also engaged in M&A to grow specific segments, and reported on its annual report on Form 10-K that the goodwill determined by the allocation of Unify Square's purchase price had been recorded in DWS.[127]

In *Sassano*, this court observed that "[c]learly World Markets is . . . an 'enterprise,'" indicating that, for the *Sassano* court, it was not a close question. 948 A.2d at 470. Here, Plaintiffs have made at least as strong a showing as reflected in

---

[125] Tr. 75:21–76:2 (McGarvey).

[126] JX 90 at 22; *accord* Tr. 171:10–13 ("Q: As to Unisys reportable segments, intersegment sales and transfers are priced as if the sales or transfers were to third parties; correct? A: That is correct.").

[127] JX 90 at 46 ("Goodwill determined by the allocation of the purchase price has been recorded in the company's DWS segment and is not deductible for tax purposes."); *id.* at 85 (Thomson's signature on the Form 10-K); Tr. 172:10–15 (Thomson) (confirming that he signed the Form 10-K in his capacity as the executive vice president and CFO of Unisys); *but see* Tr. 172:16–173:23 (Thomson) (testifying that this description of the treatment of the goodwill from the deal was "technically inaccurate" because "'Recording' is a very specific accounting term. That means you recorded it in a trial balance or a general ledger. DWS has neither.").

*Sassano*. Based on the post-trial record before it in the present action, the court concludes that DWS was an "enterprise."

Finally, Defendant contends that the extension of advancement rights in this manner is commercially unreasonable. The court disagrees. The DGCL enables a corporation to provide advancement to employees and agents who serve other forms of business endeavors at the corporation's request. The statute does not limit corporations' ability to provide advancement to only persons serving legal entities. At the same time, corporations do not have to offer advancement in the first instance. "No Delaware corporation is required to provide for advancement of expenses." *Homestore*, 888 A.2d at 218. When a corporation does, it has broad powers and flexibility to tailor its advancement regime to suit its unique needs and desires. "If an entity wishes to grant advancement rights to all of its employees, it can. If an entity wishes to extend advancement rights further to agents, it can. Whether an entity wishes to grant advancement rights broadly or narrowly is a decision for the entity." *Aleynikov*, 2016 WL 3763246, at *6. When a corporation mandates advancement to the full extent of what is permissible under the statute, it must honor the attendant obligations that flow from that decision. The drafters here made that full extent mandatory, and the court must give effect to the clear language of the Certificate. "Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words

found in the written instrument." *Sassano*, 948 A.2d at 462 (footnote omitted).

Unisys "voluntarily extended its indemnification duties to cover circumstances where indemnification is permissive by default." *VonFeldt II*, 714 A.2d at 85. "Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

Therefore, the court finds that Gilbert and McGarvey served as employees of an enterprise at Unisys's request and, under Section 2(a) of Article X of the Certificate, are entitled to advancement from Unisys because they are being sued in the Pennsylvania Action by reason of the fact that they so served.

### D. Plaintiffs are Entitled to Advancement of Outstanding and Future Fees in the Pennsylvania Action and Fees on Fees in This Action.

In its pretrial brief and its post-trial answering brief, Defendant argues that Plaintiffs are not entitled to advancement because Atos has been paying Plaintiffs' fees in the Pennsylvania Action.[128] Defendant argues that under *Pontone*, Plaintiffs are not entitled to advancement for litigation expenses already advanced by Atos. *See* 100 A.3d at 1045 (holding that its advancement plaintiff "does not have standing with respect to claims for advancement of the expenses that already have been paid"); *see also id.* (holding that the unavailability of advancement of such funds

---

[128] Def.'s Pretrial Br. 31; Def.'s Post-Trial Answering Br. 43–44.

was "without prejudice to any claim that [the secondary payor] may have for contribution against [the defendant] in the indemnification stage of this matter").

Plaintiffs did not address this argument in their pretrial brief or their post-trial opening brief, and made only passing reference to the argument in a footnote of their post-trial reply brief, without addressing the case law. And even there, Plaintiffs merely argued that "[t]o the extent that Atos has advanced fees to Plaintiffs for the Pennsylvania Action, Atos has done so solely as a voluntary secondary payer with a right of recovery against the primary obligor, Unisys."[129] Arguments that are not presented in briefs are waived. *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (internal quotation marks omitted)). A passing reference in a footnote does not suffice. *See Sabree Env't & Constr., Inc. v. Summit Dredging, LLC*, 149 A.3d 517 (Del. 2016) (TABLE) ("[S]tandalone arguments in footnotes are usually not considered fairly raised in any court."); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *20 (Del.

---

[129] Pls.' Post-Trial Reply Br. 32 n.9.

Ch. Mar. 28, 2018) (ruling that an "'argument' consist[ing] of a passing reference in a footnote in their Opening Brief" was "not properly briefed" and "deemed waived," observing that "failure to raise a legal issue in the above-the-line text of a brief generally constitutes waiver of that issue"). But even if the court were to consider Plaintiffs' argument, it does not help them for present purposes. Plaintiffs contend only that Atos—a non-party to this action—might have a claim against Unisys for fees that it has advanced on Plaintiffs' behalf. That issue is not before the court in this action, and Plaintiffs did not expound upon any implications it may have with respect to their entitlement to advancement from Unisys.[130]

On the other hand, as *Pontone* recognized, Plaintiffs' inability to obtain advancement from Unisys for amounts already advanced by Atos does not alter Unisys's obligations to advance Plaintiffs their outstanding and future costs in the Pennsylvania Action. 100 A.3d at 1046 ("The fact that a third party is willing to honor its contractual commitments to the plaintiff if called upon to do so should not serve as a basis for a defendant to escape its own, independent and commensurate, contractual obligations."). Therefore, Defendant must advance to Plaintiffs their future expenses, and those expenses incurred and not already advanced by Atos.

---

[130] *See Creel v. Ecolab, Inc.*, 2018 WL 5733382, at *5–8 (Del. Ch. Oct. 31, 2018) (collecting cases).

Additionally, Plaintiffs are entitled to their fees incurred in procuring their advancement rights in this action. Section 2(b) of Article X of the Certificate provides that if a claimant under Section 2(a) brings suit to enforce their right to advancement or indemnification and is "successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim."[131] Plaintiffs have successfully established their entitlement to advancement. Therefore, they are entitled to recover their fees under the Certificate.

## III.   CONCLUSION

In conclusion, Plaintiffs were officers of Unisys, and are entitled to advancement as such. In addition, Gilbert is entitled to advancement through his former service as President of Unify Square, and both Plaintiffs are entitled to advancement by reason of their service of DWS at the request of Unisys. Plaintiffs' receipt of the fees for this litigation from Atos pursuant to its voluntary assumption of liability subject to Plaintiffs' seeking advancement from Unisys does not preclude Plaintiffs' ability to receive advancement for outstanding and future costs. Finally, because they were successful in whole or in part, Plaintiffs are entitled to recover their fees incurred in this proceeding from Defendant.

---

[131] JX 1 Art. X § 2(b).

The parties shall confer and submit an implementing order within five days of this opinion.